PEOPLE ex rel. ELMIRA ADVERTISER ASS'N v. GORMAN et al.

(Supreme Court, Special Term, Chemung County. June 18, 1915.)

1. NEWSPAPERS ⬖1—CHARACTER OF PAPER—DESIGNATION.
   Where the requirement for designating a newspaper as the official paper of the county is that it shall have supported the prevailing party at the last election, the fact that its owner and editor supported another party is immaterial, if the paper itself supported the successful party.
   [Ed. Note.—For other cases, see Newspapers, Cent. Dig. §§ 1–13; Dec. Dig. ⬖1.]

2. NEWSPAPERS ⬖1—DESIGNATION—EVIDENCE.
   Evidence of the words of the newspaper itself *held* to show that it did not support the prevailing party at the last election, so as to entitle it to be designated the official paper of the county.
   [Ed. Note.—For other cases, see Newspapers, Cent. Dig. §§ 1–13; Dec. Dig. ⬖1.]

3. NEWSPAPERS ⬖1—DESIGNATION—ACTS OF PARTY.
   Since a political party can act only through its organization, a newspaper cannot be held to have supported the party, where it supported alleged members who attempted to act independently.
   [Ed. Note.—For other cases, see Newspapers, Cent. Dig. §§ 1–13; Dec. Dig. ⬖1.]

4. NEWSPAPERS ⬖1—DESIGNATION—SUPPORT OF PARTY.
   Statements of a newspaper: "The bunghole Democrats and their allies, the bunghole Republicans, are astounded that they should be put to such an effort to control the politics of this district. They have not yet realized what a revolt there is among the people of all parties against further domination of our politics by the boss element and the fifty-fiftyites"—show opposition to, and not support of, the prevailing party, so that it cannot be made the official paper of the county.
   [Ed. Note.—For other cases, see Newspapers, Cent. Dig. §§ 1–13; Dec. Dig. ⬖1.]

5. NEWSPAPERS ⬳1—DESIGNATION—REQUIREMENTS.

Making a paper the official paper of the county, being a form of patronage, will necessarily require that the paper most loyal to the prevailing party be made official.

[Ed. Note.—For other cases, see Newspapers, Cent. Dig. §§ 1–13; Dec Dig. ⬳1.]

6. NEWSPAPERS ⬳1—DESIGNATION—REQUIREMENTS—EVIDENCE.

Evidence of the acts of a paper during a campaign *held* to show support of the prevailing party, so as to warrant making it the official paper of the county.

[Ed. Note.—For other cases, see Newspapers, Cent. Dig. §§ 1–13; Dec. Dig. ⬳1.]

7. NEWSPAPERS ⬳1 — DESIGNATION — DISCRETION OF BOARD — REVIEW BY COURTS.

The acts of the board of supervisors in naming the official county paper, being within their discretion, will not, in the absence of fraud, be disturbed by the courts.

[Ed. Note.—For other cases, see Newspapers, Cent. Dig. §§ 1–13; Dec. Dig. ⬳1.]

Petition for writ of mandamus by the People of the State of New York, on the relation of the Elmira Advertiser Association, against Frank J. Gorman, as Clerk of the Board of Supervisors of Chemung County, and others. Writ denied.

Order affirmed by Appellate Division, 155 N. Y. Supp. 727.

James O. Sebring, of Corning, for petitioner.

Richard H. Thurston and Hosea H. Rockwell, both of Elmira, for respondents.

KILEY, J. The petition of the petitioner in the above-entitled matter was verified on the 15th day of April, 1915. The motion was brought on for argument at a term of this court held in the city of Elmira April 26, 1915. The petitioner asks for a writ of mandamus requiring the board of supervisors to meet, convene, and designate the petitioner, the Elmira Advertiser Association, as the paper fairly representing the Republican party, and alleging that its paper supported the principles of the Republican party and its nominees in the state of New York and Chemung county, at the last general election. The reason for the petition, and the proceedings founded thereon, is that the Republican members of the board of supervisors of Chemung county, in the month of December, 1914, designated the Elmira Star-Gazette, published at Elmira, Chemung county, N. Y., as the paper that "more nearly advocates the principles of the Republican party than any other newspaper published in said county, and during the last general election supported more of its candidates than any other newspaper."

It was disclosed by the answering affidavits used upon the argument and presentation of this motion that hostility existed between the petitioner and the Republican organization of Chemung county to an extent that suggests some reason must have existed for that hostility. There are 19 Republican members of the board of supervisors of Chemung county, and they unanimously resolved that the petitioner no longer

supported the principles of the party to which they belonged and in whose interest they were called upon to act by the provisions of the statute.

It appears that the principal owner of the petitioner is Mr. Milo Shanks, of Elmira, N. Y., and that he owns the controlling interest in said paper and is its publisher. The affidavits, presented in opposition to the petitioner's motion, contain statements claimed to have been made by the publisher to the effect that he had joined another party and did not intend to support the candidates of the Republican party, and that the other party, to whom he was about to give allegiance, was going to sweep the state; that other party was one founded by ex-Governor Sulzer, known as the "Guardians of Liberty."

[1] In answering this allegation, Mr. Shanks denies that he made this statement, and swears that he is a Republican. This portion of the matter furnished on the contested questions at issue is referred to here solely for the purpose of saying that it is not pertinent to the issue and can have no bearing upon the questions considered. It leads to the further observation that a man has a right to belong to any party that represents his ideas and way of thinking, and he may conduct and publish a Republican newspaper, providing he supports the policies and candidates of that party.

[2] It was intimated upon the argument that, in the final analysis, what a newspaper itself disclosed was its policy during the last campaign, as to its support of the policies and candidates of the Republican party, would be the strong force in determining the policy of that paper. To that end the court directed the contending parties, to wit, the petitioner and the Elmira Star-Gazette, to which it was opposed, to furnish to the court files of their respective papers for a period covering the campaign months, that a personal examination might be made. Acceding to that request, the respective parties have filed with the court copies of their several issues from a time previous to primary day, in September, 1914, until after election day of the same year. A careful perusal of the petitioner's newspaper forces upon the court the feeling that, if the only support the Republican party had in Chemung county came from petitioner's paper, it was either unworthy of support, or that honest support, by a paper claiming to be a Republican paper, was knowingly, wantonly, and maliciously withheld. No attempt will be made here to determine which reason impelled the absence of support to the Republican party from the columns of the petitioner's paper. A few instances will be cited that seem to reflect the attitude of the Advertiser towards the Republican party, its principles, and its nominees, and in so doing again it is asserted that no attempt will be made to give the reason for such attitude toward its party by a paper claiming to be a Republican newspaper and entitled to the emoluments such relationship affords.

In going over the files of the paper of the petitioner, to wit, the Elmira Advertiser, I was unable to determine from that paper who were the candidates of the Republican party of either state or county during the campaign of 1914. Nowhere in that paper was published a list of the Republican candidates. On the other hand, the list of the

Prohibition candidates, upon which ticket Mr. Shanks, publisher and editor of the petitioner, was running for Congress, was, almost daily, published during the interim between primary day and election day. The Progressive party had a page, or a column, in petitioner's newspaper for its use. I think it may be fairly stated that in practically every instance where the Republican party, as a party, was alluded to or mentioned by the Advertiser, or in the presence of Mr. Shanks, as published in the Advertiser, its portent, and somewhere in its context, there was contained ridicule and disparagement for the Republican party and some of its candidates and principles. It is true that Mr. Shanks claims that, notwithstanding this condition of affairs, he was and still is a Republican, and that the petitioner was and still is a Republican newspaper. The hostility seemed to be directed, in the main, against the Republican organization. The appeal made to the voters was to leave the Republican party, and its organization, and to support the Prohibition party and its candidates.

[3] Section 20 of the County Law (Consol. Laws, c. 11) must be read and considered in conjunction with the other provisions of the statute that provide that a party can only act through an organization. Even though various members of different parties conceive that the organization with which they have hitherto affiliated, in its principles and in the personnel of its candidates, does not come up to their conceived standard of excellence, and that it is time for them to make a stand for those principles, even then, they must do so through organized effort in order to comply with the statute. And I think it may be fairly said that the petitioner sought to and was supporting other principles and candidates than those of the Republican party.

[4] The editor and publisher of the petitioner and Hon. W. E. Knapp were running as candidates for Congress and county judge respectively on the same ticket, viz. the ticket of the Prohibition party. For instance, in the columns of petitioner's newspapers, within the period above referred to, I read of a mass meeting at which Mr. Shanks, the publisher and proprietor of the petitioner, was one of the speakers, and Hon. Wilmott E. Knapp, above referred to, was another of the speakers. Mr. Knapp defined himself as an independent Republican, and then defined what an independent Republican was, viz., that an independent Republican was a great deal better than an ordinary Republican, just as good as a good Democrat and a good Progressive, and the force of his argument following this declaration was to the effect that a new dispensation had come, that new standard bearers had taken the lead, that the policy, candidates, and battle cry had changed. The editor of the petitioner did not demur, and by his silence, as speaker on that occasion, concurred.

This is not observed with any spirit of criticism, but rather as showing that the Advertiser had at least taken up the support of the party that by its utterances and its writings claimed to have been better than all other parties, and to further observe that a party speaks through its candidates and its policies. The Advertiser had a right to assume the attitude it did with reference to the party policy it determined to espouse or oppose.

That the publisher and proprietor of the petitioner, and the force controlling and shaping its policies, regarded the party with which he was affiliated, and on whose ticket he was running, at that time, in the light above referred to, and that his paper was no longer supporting the Republican party, may be inferred from the following quotation on its editorial page:

"The bunghole Democrats and their allies, the bunghole Republicans, are astounded that they should be put to such an effort to control the politics of this district. They have not yet realized what a revolt there is among the people of all parties against further domination of our politics by the boss element and the fifty-fiftyites."

This editorial was written after a majority of the enrolled voters of the Republican party of Chemung county, and in the congressional district of which Chemung county is a part, had named its candidates. The Advertiser was leading a revolt, and in its reprehensible language here used referred to a majority of the Republican party voters, and which petitioner now claims is the party with which it now and ever has been affiliated. Let it be distinctly understood that Mr. Shanks is not charged with writing that editorial, or using that language. Indeed, I would be sorry to learn that he wrote it; but as it appeared in the editorial column of the Advertiser, after the primary day and before election day, the petitioner must appreciate that it must assume the responsibility for it.

[5] A paper that uses the foregoing language with reference to a majority of the Republican party voting at a primary cannot well expect a court of justice to tie the Republican party to such a paper by force of law, thereby enabling it to put the knife into its vitals at close range, and at the same time hold it should be paid for so doing. Let no one lull himself into the false security that public money, going to parties as such, is free from the flavor of patronage. That paper which most faithfully, energetically, and widely upholds and distributes the party doctrine is entitled to the benefits accruing.

The Republican members of the board of supervisors, after consideration, resolved that the Star-Gazette more nearly supported the principles, policies, and candidates of the Republican party than did the petitioner, and designated that newspaper to publish the Session Laws, concurrent resolutions, etc.

[6] An examination of the files of the Star-Gazette during the last campaign discloses that its attitude towards all candidates and parties was respectful; that the Republican party and its candidates occupied as much, if not more, space than did the candidates of any other party. That speeches of Republican candidates, notably Hon. Charles S. Whitman, candidate for Governor, were liberally published. It is an independent newspaper. It openly opposed such candidates as it conceived to be candidates of the dominant organization of the Democratic party, and through the Republican candidate for Governor stated the principles of the Republican party in a very short paragraph, preceded by large headlines. The following is referred to:

"My whole record, during my public life, shows conclusively that I have consistently and uniformly disregarded all questions of race or creed, having in mind only efficiency and integrity in the public service."

The underlying principle of every party that does succeed, or may hope to succeed, is based upon the last two lines of the above declaration, to wit:

"Having in mind only efficiency and integrity in the public service."

There is no intimation in the columns of the petitioner that the sentence quoted represents the principles of the Republican party. The petitioner does, however, in substance many times in its columns during the campaign claim it as representing the policy of the Prohibition party.

[7] If the time has not come, it is fast approaching, when courts will cease to upset the decision, after deliberation, reached by a legislative body upon a subject submitted to it by statute, and over which it has general control. Section 20 of the County Law requires the Republican members of the board of supervisors, as applied to this case, to designate a newspaper. That duty is a primary duty. It then directs those members how to designate it. That is a secondary duty, and as Judge Werner says, in People ex rel. Bonheur v. Christ, 208 N. Y. 14–15, 101 N. E. 846, that this is a general power given to those members, and with that general power there goes an implied right to say what paper, within their jurisdiction, more nearly complies with the provisions of the statute; and unless a fraud is shown on the part of the members of the board of supervisors, or it is obvious that they have violated the provisions of the statute, their decision in this regard should not be disturbed. I am of the opinion that, in the exercise of sound discretion, the granting of a writ of mandamus in this matter should be denied.

Petition dismissed, with costs to the respondents.